UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHAFFE MCCALL, LLP                          CIVIL ACTION

VERSUS                                       NO: 08-4432

WORLD TRADE CENTER OF NEW                    SECTION: "J"(2)
ORLEANS ET AL

## ORDER AND REASONS

Before the Court is Interpleader Plaintiff/Counter-Defendant
Chaffe McCall, LLP's ("Chaffe") **Rule 12(b)(6) Motion to Dismiss
(Rec. Doc. 64)**, seeking an order dismissing the counterclaim of
Defendant Full Spectrum of New York, L.L.C.'s ("Full Spectrum")
(Rec. Docs. 44, 61, & 67) against them.  Also before the Court is
Interpleader Defendant/Counter-Claimant Full Spectrum's **Motion
for Leave to File 2nd Supplemental & Amending Counterclaim (Rec.
Doc. 80)**.  The Court has considered the record, the memoranda and
arguments of counsel, and the applicable law, and now finds as
follows.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This matter is before the Court pursuant to Chaffe's
interpleader complaint filed against  World Trade Center of New
Orleans ("WTC"), New Orleans Building Corporation ("NOBC"), Full
Spectrum, and Davillier Law Group, L.L.C. ("Davillier") (Rec.
Docs. 1 & 50).  The interpleader action arises out of an Escrow
Agreement entered by the interpleader defendants/claimants in

1

connection with a lease proposal by Full Spectrum that was
accepted by a selection committee on behalf of WTC and NOBC.
Pursuant to the selection committee's agreement with Full
Spectrum, Full Spectrum was selected to be the long term
developer for leasing and redevelopment of the WTC building.  In
accordance with the lease proposal and acceptance process, Full
Spectrum was required to deposit $600,000 in escrow pending
negotiation and execution of a final lease agreement.  Chaffe was
the selected escrow agent, and the funds were deposited in
accordance with the Escrow Agreement.

Unfortunately, Full Spectrum, WTC, and NOBC were unable to
agree to terms for the long term lease and redevelopment of the
WTC building.  As such, Full Spectrum asserts that on August 19,
2008, it demanded return of the escrowed funds plus interest
(minus reasonable fees of the escrow agent not to exceed $1,000),
pursuant to the Escrow Agreement.  Further, as the result of an
assignment, Full Spectrum demanded that $500,000 be disbursed to
it and the remaining $100,000 be disbursed to Davillier, pursuant
to a partial assignment of rights under the Escrow Agreement.
However, on August 27th, 2008, WTC objected to the return and
instructed Chaffe not to comply.  Full Spectrum contends that the
Escrow Agreement requires return of the funds within 15 days of
demand unless the escrow agent institutes a concursus proceeding

in the interim.[1]

Full Spectrum filed suit against Chaffe in the Civil
District Court for the Parish of Orleans ("CDC") on September 17,
2008 (31 days after its initial demand) seeking specific
performance of the Escrow Agreement's return provisions.  Chaffe
filed the instant interpleader action in this Court on September
18, 2008, immediately after it was notified of Full Spectrum's
suit in CDC.  Chaffe then deposited the escrowed funds
($627,312.54 of principal and interest) into this Court's
registry on September 23, 2008 (Rec. Docs. 4 & 5).  Given the
parallel litigation before the state court and this Court, Chaffe
sought a permanent injunction against Full Spectrum's state court
suit, and Full Spectrum in turn sought dismissal or stay of
Chaffe's interpleader suit in this Court in favor of its own
state court action for declaratory judgment.  The Court granted
Chaffe's request, and issued an injunction barring prosecution of
any other action in state or federal court related to payment of
and/or entitlement to the funds deposited in this Court's
registry in connection with the present interpleader action.

_____

[1] As Chaffe has noted in its reply brief, between the time
of Full Spectrum's August 19, 2008 request for disbursement and
the eventual September 18, 2008 institution of the present
interpleader action, Hurricane Gustav intervened, resulting in
the evacuation of the greater New Orleans metropolitan area and
the related closing of most businesses - including the offices of
counsel for Chaffe and Full Spectrum/Davillier - for the entire
first week of September.

(Rec. Doc. 33).  The Court later extended the injunction to include Davillier, which was added as an interpleader defendant after the Court's initial injunction order. (Rec. Doc. 52).

After the litigation was restricted to this Court, Full Spectrum filed counter-claims against Chaffe, WTC, NOBC, and E. Howell Crosby - an attorney with the Chaffe firm who acted as escrow agent[2] - alleging breach of the escrow agreement.  See Rec. Doc. 67, Second Amended and Supplemental Counterclaim. Generally, Full Spectrum asserts that Crosby unilaterally reset the deadlines established in the Escrow Agreement regarding the time-line for return of escrowed funds upon request of a party and/or disputes regarding such return.  Specifically, Full Spectrum asserts that Crosby and/or Chaffe refused to bring a concursus proceeding within the fifteen day period allegedly required by the Escrow Agreement, which refusal was intended to allow Crosby and Chaffe's clients WTC and NOBC additional time to negotiate for a portion of the proceeds.

---

[2] Chaffe notes that Crosby was merely acting as a member of Chaffe and, thus, was technically not a party to the escrow agreement.  However, out of an abundance of caution, Chaffe added Crosby individually as an interpleader defendant on the possibility that it may be determined that Crosby was the escrow agent *as an individual* and thus is entitled to some of the escrowed funds as a result of his performance of his escrow agent duties.  As a result, Full Spectrum's counter-claims are asserted against both Chaffe and Crosby.  In any event, because the briefing on the present motion essentially treats Chaffe and Crosby collectively as the escrow agent, the Court will do the same.

Chaffe's present motion seeks an order dismissing Full Spectrum's counter-claims. Full Spectrum has filed a motion for leave to file an amended counter-claim to properly state a claim against Chaffe.

**THE PARTIES' ARGUMENTS**

**A.   Chaffe's Motion to Dismiss**

As an initial matter, Chaffe argues that the Escrow Agreement releases both it and Crosby from liability for any actions they took as escrow agent, with the exception of any bad faith. In support of this argument, Chaffe and Crosby cite the following provision of the Escrow Agreement:

> 3. **Escrow Agent's Duties**.   Without in any way limiting any other provision of this Agreement, it is expressly understood and agreed that the Escrow Agent shall be under no duty or obligation to give any notice, or to do or to omit the doing of any action, with respect to the Escrowed Funds, except to make disbursement in accordance with the terms of this Agreement.   The Escrow Agent shall not be liable for any error in judgment, or any act or steps taken or permitted to be taken in good faith, or for any mistake of law or fact, or for anything they may do or refrain from doing in connection herewith, unless it acts or omits to act in bad faith.

Rec. Doc. 64-2, Escrow Agreement, pp. 2-3, § 3.   Chaffe and Crosby argue that this release of liability is enforceable under Louisiana law.   See La. Civ. Code. art. 2004; <u>Houston Exploration Co. v. Haliburton Energy Servs., Inc.</u>, 269 F.3d 528, 531 (5th Cir. 2001) (noting that Louisiana law allows for contracts limiting liability, other than waivers for intentional misconduct

5

or gross negligence). Chaffe and Crosby contend that this provision absolves them from any liability arising from the Escrow Agreement, unless that liability is based on their breach of the agreement in bad faith, which Louisiana law defines as "intentional and malicious failure to perform." La. Civ. Code art. 1997, comment e; Pellerin Constr. Inc. v. Witco Corp., 169 F. Supp. 2d 568, 585 (E.D. La. 2001) ("Bad faith involves 'some interested or sinister motive' and implies the "conscious doing of a wrong for dishonest or morally questionable motives."). Chaffe and Crosby argue that Full Spectrum have not alleged and cannot prove that they acted in bad faith. Furthermore, Chaffe and Crosby note that it was actually WTC that instructed them not to disburse the funds - a fact which Full Spectrum itself admits in its counterclaims.

As such, Chaffe and Crosby argue that they did exactly what the Escrow Agreement called for - namely, the filing of a concursus proceeding - in light of the WTC's instruction not to release the funds. Specifically, Chaffe and Crosby cite the following provision of the Escrow Agreement:

> 4. **Right of Concursus Proceeding.** Should any controversy arise between or among the Selection Committee [i.e. the WTC and NOBC] and Full Spectrum, or any other person, firm or entity, with respect to this Agreement or the Escrowed Funds, or the Escrow Agent should be in doubt as to what action to take, the Escrow Agent shall have the right to (I) withhold delivery of the Escrowed Funds until the conflicting demands are withdrawn or the doubt or controversy is resolved by a court of competent jurisdiction or by consent of the

parties, or (ii) invoke a concursus proceeding to
determine the rights of the parties hereto.

Rec. Doc. 64-2, p. 4 at § 4. Chaffe and Crosby argue that the

procedure outlined in this paragraph is precisely the one they

followed – there was a dispute among the parties regarding the

escrowed funds, and thus Chaffe and Crosby filed the instant

interpleader action. As such, Chaffe and Crosby argue that Full

Spectrum has not stated a cause of action for breach of the

Escrow Agreement.

Chaffe and Crosby recognize the provision of the Escrow

Agreement that requires return of the escrowed funds within 15

business days of Full Spectrum's notification that negotiations

had failed.[3] Chaffe and Crosby also do not deny that the present

---

[3] The referenced provision of the Escrow Agreement provides
as follows:

>     (B)   In the event the Selection Committee and Full
>           Spectrum are unable after good faith efforts have
>           been made by both parties to reach a mutually
>           acceptable form for the Lease or Full Spectrum
>           determines and notifies the Selection Committee
>           prior to the expiration of the Due Diligence Period
>           that the Property is unacceptable because of
>           unsatisfactory results on any of the due diligence
>           items attached on Schedule 1 as they relate to the
>           development as contemplated in the Full Spectrum
>           Proposal, the Deposit, less any reasonable expenses
>           of the Escrow Agent, not to exceed $1,000.00,
>           incurred in the administration of the Escrowed
>           Funds, shall be returned to Full Spectrum within 15
>           business days after its notification unless the
>           Escrow Agent has instituted a concursus proceeding
>           in accordance with the provisions of this
>           Agreement[.]

7

interpleader action was not filed within 15 days of Full

Spectrum's initial demand for disbursement of the escrowed funds,

less escrow costs up to $1,000.  However, Chaffe and Crosby argue

that the 15 day time period provided at § 2(b) of the Escrow

Agreement must be read in conjunction with the remaining

provisions of that section:

> Prior to disbursing any portion of the Escrowed Funds,
> Escrow Agent shall provide at least five (5) business
> days prior written notice to the Selection Committee and
> Full Spectrum of Escrow Agent's intent to do so and the
> details regarding the proposes disbursement.  In the
> event that any party hereto objects in writing to such
> proposed disbursement, Escrow Agent shall delay such
> proposed disbursement for an additional period of five
> (5) business days in order for the parties to resolve any
> disputes as to the distribution. In the event the Escrow
> Agent does not receive joint written instructions from
> the Selection Committee and Full Spectrum during said
> five (5) business day period as to the proper
> distribution of the Escrowed Funds, Escrow Agent shall
> promptly proceed to invoke a concursus in accordance with
> the provisions of section 4 herein below.

Rec. Doc. 64-2, p.2 at § 2.  Chaffe and Crosby argue that

notwithstanding the 15 day limit provided in § 2(b), their

institution of these interpleader proceedings on September 18,

2008 was in compliance with the Escrow Agreement.  Specifically,

Chaffe and Crosby note that Full Spectrum's demand was made on

August 19 and WTC instructed them not to issue the disbursement

on August 27 - *less than 15 days from the August 19 demand*.

Given WTC's instruction, Chaffe and Crosby argue that they *could*

---

Rec. Doc. 64-2, p.2 at §2(b).

*not have* immediately instituted a concursus proceeding under §
2(b), but had to provide five business days for possible
resolution of the dispute and submission of joint written
instructions from WTC, NOBC, and Full Spectrum. Then, after
receiving no such instructions, Chaffe and Crosby argue that they
did in fact act "promptly" in filing the present interpleader
action on September 18 - 15 days after WTC's non-disbursement
instruction - in accordance with the provisions of the Escrow
Agreement. As a result, Chaffe and Crosby contend that Full
Spectrum's claims fail on their face in light of their compliance
with their duties as escrow agent under the Escrow Agreement.

In opposition, Full Spectrum argues that Chaffe and Crosby's
reliance on the release provision of the Escrow Agreement is
unfounded. Full Spectrum argues that Chaffe and Crosby rely
solely on the second sentence of § 3 without recognizing the
effect of the first sentence. Specifically, Full Spectrum argues
that the first sentence provides a qualification to the release
from liability - namely, that the Escrow Agent has no duty
"*except to make disbursements in accordance with the terms*" of
the Escrow Agreement. Rec. Doc. 62-2, p. 3 at § 3 (emphasis
added). As such, Full Spectrum argues that while the release
provisions of the second sentence of § 3 may have relieved Chaffe
and Crosby of liability for other aspects of their duties as
escrow agent, the first sentence of the section reserves

liability for breaches of their specific duty of making disbursements in accordance with the terms of the Escrow Agreement. In fact, Full Spectrum argues that this specific exception to the general release provision is in accordance with Louisiana law, which prohibits escrow agents from altering the terms of an escrow agreement on their own discretion.

Next, Full Spectrum argues that, in any event, Chaffe and Crosby acted in bad faith so as to nullify any effect of the release provisions of § 3 by *intentionally breaching the Escrow Agreement*. Full Spectrum has alleged in its counter complaint that Crosby refused to institute the present interpleader action within the 15 day period allotted by § 2(b) of the Escrow Agreement due to his loyalty as counsel for WTC and NOTB. Alternatively, Full Spectrum alleges that Crosby breached the agreement when he did not promptly institute the interpleader action within five days after WTC objected to Full Spectrum's request for return of funds, which in turn allowed WTC and NOTB extra time to negotiate for a return of a certain portion of the proceeds to them. Full Spectrum contends that § 2 of the Escrow Agreement required that the interpleader action be filed *within 5 days after an objection to disbursement*. However, Crosby did not file the interpleader until September 18 – *15 business days* after WTC's August 27 objection. Full Spectrum argues that the Escrow Agreement contains conflicting provisions – namely § 2(b) and the

remainder of § 2 – regarding when the necessary concursus proceeding should be filed. In any event, Full Spectrum argues that Crosby failed to comply with either provision, and thus acted in bad faith by failing to return the escrowed funds within 15 days and/or to file a concursus proceeding in accordance with the time limits established in the Escrow Agreement. Finally, and in the alternative, Full Spectrum argues that Crosby's actions – even if they do not rise to the level of willful or malicious acts of bad faith – at least constitute gross negligence, liability for which cannot be released under Louisiana law. See La. Civ. Code art. 2004.

In the end, Full Spectrum contends that in order to prevail on their Rule 12(b)(6) motion, Chaffe and Crosby must establish that Full Spectrum can prove *no set of facts that would entitle it to relief*. <u>Bolen v. Dengel</u>, 340 F.3d 500 (5th Cir. 2003).

In reply, Chaffe and Crosby note that Full Spectrum's Second Amended and Supplemental Counterclaim – upon which it relies for its arguments in opposition to Chaffe and Crosby's 12(b)(6) motion – is not properly before the Court at this time. Specifically, Full Spectrum did not seek leave to file the second amended counterclaim as required by Rule 15(a)(2) of the Federal Rules.[4] Regardless, Chaffe and Crosby contend that even if the

---

[4] The unique procedural posture of Full Spectrum's proposed Second Amended and Supplemental Counterclaim is discussed at further length below in section B.

second amended counter-claim were in the record, it *still* fails
to state a claim on which relief can be granted. As an initial
matter, Chaffe and Crosby argue that Full Spectrum misreads the
Escrow Agreement in its contention that a concursus proceeding
had to be instituted within five days of WTC's objection to the
disbursement. See Rec. Doc. 67, pp. 5-6 at ¶ XVIII. Rather, the
Escrow Agreement requires that such a proceeding be filed
"promptly" after the five-day period.[5]

Further, Chaffe and Crosby argue that they adhered to the
timeline contemplated in the Escrow Agreement in light of the
circumstances of this case. Specifically, Chaffe and Crosby note
that the five day period after WTC's objection to the
disbursement on August 27 would have run on September 4, 2008, as
the weekend of August 30-31 and the Labor Day holiday on
September 1 would not have counted. As such, Chaffe and Crosby
note that Full Spectrum's statement in its opposition that the
present interpleader was filed fifteen days after the August 27
objection is incorrect - given the evacuation week of September 2
through the 7 - because the interpleader was filed *ten business
days* after the objection on September 18.

Additionally, Full Spectrum notes that, with the approach of

---

[5] Counsel for Full Spectrum conceded the misreading of the
Escrow Agreement at oral argument, and admitted that Chaffe and
Crosby were not required to file a concursus within five days of
the objection.

Hurricane Gustav and the impending evacuation, all three parties to the Escrow Agreement agreed *and confirmed in writing* that the parties would allow the passage of the storm before re-setting the five business day period for possible resolution of the disbursement issue. See Rec. Doc. 78-1. As such, after the passage of the hurricane and the re-opening of business on September 10, 2008, Chaffe and Crosby re-set the five day period, which would have ended on September 17, 2008 (the 13th and 14th not counting as weekends). In fact, Chaffe and Crosby specifically informed the parties that the period would end by close of business on September 17, at which point Crosby would file a concursus absent any resolution. See Rec. Doc. 78-3. With no resolution, Crosby filed the present interpleader *one day later* on September 18. Thus, Chaffe and Crosby argue that the interpleader was filed "promptly" as contemplated by the Escrow Agreement. Furthermore, Chaffe and Crosby contend that any allegation of bad faith is belied by the facts of the case. In fact, if Chaffe and Crosby had filed the interpleader any earlier, it would have resulted in legal costs *before* it was even apparent that the parties' could not resolve their dispute. As such, the release provisions of § 3 of the Escrow Agreement defeat Full Spectrum's claims.

Finally, Chaffe and Crosby note that Full Spectrum has stated the incorrect standard for review of the pleadings under

Rule 12(b)(6).  Rather than requiring a showing that "no set of

facts" exist that might entitle the plaintiff to relief, a Rule

12(b)(6) inquiry considers whether the plaintiff has stated

"enough facts to state a claim . . . that is plausible on its

face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)

(abrogating the "no set of facts" test set forth in Conley v.

Gibson, 355 U.S. 41 (1957)).[6]

### B.   Full Spectrum's Motion for Leave

At the time Chaffe and Crosby filed their motion to

dismiss, Full Spectrum's counter-complaint *did not include any*

*bad faith allegation*.  See Rec. Doc. 61.  It was only after

Chaffe and Crosby filed their instant motion that Full Spectrum

filed a second amended complaint to add bad faith allegations

against Chaffe and Crosby.  Rec. Doc. 67.  Despite the fact that

this second amended counter-claim was entered into the record by

the Clerk of Court, Full Spectrum should have sought leave to

file its second amended complaint, in accordance with the

provisions of Rule 15 of the Federal Rules of Civil Procedure.

As a result, Full Spectrum's Second Amended Counterclaim was

marked deficient, immediately prior to the oral argument on the

motion to dismiss, for failure to seek leave of this Court to

amend.  Thus, as the record stood at the time Chaffe and Crosby's

---

[6]  Counsel for Full Spectrum conceded at oral argument that
the "no set of facts" inquiry is not the proper standard for
consideration of a motion under Rule 12(b)(6).

14

motion to dismiss was argued, the only counter-complaint filed by Full Spectrum did not even include any allegation of bad faith on the part of Chaffe and Crosby.

Nonetheless, Full Spectrum now seeks leave to file its Second Supplemental and Amended Counter-Claim. The proposed second amended complaint is identical to the version that was previously improperly filed. Full Spectrum argues that amendments under Rule 15 should be liberally granted, and thus seeks leave to amend to clarify its claims against Chaffe and Crosby.

## DISCUSSION

### A.    Chaffe/Crosby's Motion to Dismiss

As set forth by the Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007), the standard to be applied when deciding a Rule 12(b)(6) motion is not whether it is conceivable that some set of facts could be developed to support the allegations in the complaint, but rather whether the plaintiffs have stated enough facts in the complaint to allow a court to conclude that it is "plausible" that the plaintiffs are entitled to relief. The Court must accept as true all well-plead allegations and resolve all doubts in favor of the plaintiff. <u>Tanglewood East Homeowners v. Charles-Thomas, Inc.</u>, 849 F.2d 1568, 1572 (5th Cir. 1988).

As an initial matter, the Court finds - and the parties

agreed at oral argument – that the terms of the Escrow Agreement
are internally inconsistent and facially ambiguous with respect
to the escrow agent's responsibilities in the event of a disputed
disbursement request.  Nonetheless, in light of the § 3 release
provisions and under the standard set forth in Twombly, Chaffe
and Crosby's motion should be granted under the terms of the
Escrow Agreement.

First of all, Full Spectrum's parsing of the two sentences
in the release provision at § 3 does not withstand scrutiny.
Full Spectrum argues that the first sentence of the release
provision – which provides that the "Escrow Agent shall be under
no duty . . . except to make disbursement in accordance with the
terms of this Agreement" – should be read in isolation from the
rest of the section – which releases the Escrow Agent from all
liability except for bad faith – with respect to the duty of
disbursement.  This proposed piecemeal reading of § 3 does not
comport with the principles of contract interpretation under
Louisiana law:  "Each provision in a contract must be interpreted
in light of the other provisions so that each is given the
meaning suggested by the contract as a whole."  La. Civ. Code
art. 2050.  The release provision, when read as a unified whole,
clearly indicates the parties' intent to release the Escrow Agent
from any liability arising out of its good faith execution of its
duties.

Furthermore, even if Full Spectrum's disjunctive reading of the provision were proper, a stand-alone reading of the first sentence of § 3 would not result in liability for Chaffe and Crosby in the instant case. Full Spectrum argues that the first sentence of § 3 creates a duty and liability for Chaffe and Crosby related to disbursement of the escrowed funds, separate and apart from their other duties under the agreement. However, the language of the first sentence provides that any such disbursement duty must be interpreted "in accordance with the terms of this Agreement." Thus, even if Full Spectrum's isolation of the first sentence of § 3 were appropriate as a matter of contract interpretation, *the first sentence still incorporates the remainder of the Escrow Agreement's terms* as they relate to the disbursement duty. In this light, it is interesting to note Full Spectrum's concession that "[t]here are conflicting provisions in the escrow agreement that govern when a concursus proceeding shall be brought." Rec. Doc. 68, p. 6. Given that any free-standing disbursement duty provided in the first sentence of § 3 would *necessarily* implicate the admittedly unclear provisions regarding institution of a concursus proceeding, Full Spectrum's argument that Chaffe and Crosby breached that duty simply by not disbursing the funds fails on its face. In sum, Full Spectrum's concession that the provisions of the Escrow Agreement regarding institution of concursus

17

proceedings are contradictory defeats the  argument - which, to
reiterate, is untenable as a matter of contract interpretation -
that Chaffe and Crosby breached some free-standing duty to
disburse the funds.

As such, Full Spectrum's claims against Chaffe and Crosby
can only proceed on a showing of bad faith failure to disburse
the escrowed funds and/or the failure to institute a timely
concursus proceeding.  Once again, Full Spectrum's concession
that the terms of the Escrow Agreement are contradictory vis-a-
vis the provisions governing institution of a concursus
proceeding is fatal to its alleged bad faith claims against
Chaffe and Crosby.  Given the admittedly ambiguous provisions
regarding the proper time period for filing the concursus
proceedings, Chaffe and Crosby's actions in the instant matter
did not rise to the level of bad faith - their handling of the
disbursement request and the subsequent concursus proceeding were
not indicative of some "conscious doing of a wrong for dishonest
or morally questionable motives."

As an initial matter, the Court recognizes that § 2(b) of
the Escrow Agreement does provide a fifteen day period within
which the Escrow Agent must institute a concursus action in the
event that WTC, NOTB, and Full Spectrum's negotiations were to
break down.  However, § 2(b) also provides two specific
triggering mechanisms for the fifteen-day period preceding

institution of the concursus action:

> **[1]** the Selection Committee and Full Spectrum are **unable after good faith efforts have been made by both parties to reach a mutually acceptable form for the Lease** or **[2] Full Spectrum determines and notifies the Selection Committee** prior to the expiration of the Due Diligence Period **that the Property is unacceptable because of unsatisfactory results on any of the due diligence items attached on Schedule 1** as they relate to the development as contemplated in the Full Spectrum Proposal . . . .

Rec. Doc. 64-2, p.2 at §2(b) (emphasis added). Thus, the only two contingencies that could trigger the allegedly hard-and-fast fifteen day period for the institution of a concursus proceeding are (1) failure of the underlying lease negotiations or (2) Full Spectrum's notification that the property was unsatisfactory based on predetermined criteria. Neither party argues that the second contingency is at issue in the instant case. Rather, Full Spectrum contends that the parties were unable to reach a mutually acceptable lease agreement, and that this stalemate prompted their August 19, 2008 request for disbursement. Chaffe and Crosby, on the other hand, simply note that "a controversy arose between at least two" of the parties to the Escrow Agreement prior to the August 19 demand, but do not indicate whether the "controversy" rose to the level of an inability to proceed with lease negotiations. If Full Spectrum's contention is correct that their request for disbursement was preceded by a full breakdown of negotiations, then their argument that the hard-and-fast fifteen day concursus period was triggered on

August 19 bears slightly more weight.  However, if, as Chaffe and Crosby argue, the August 19 demand was *not* preceded by a full breakdown of negotiations, then the fifteen-day period would *not have* been triggered.  Thus, this slightly different presentation of the events leading up to the August 19 demand is  relevant to the applicability of the fifteen-day concursus period.

However, in any event, and regardless of the what triggered the August 19 demand, the remainder of § 2 of the Escrow Agreement reveals that the fifteen day period - which Full Spectrum argues was a hard-and-fast constraint on the Escrow Agent - was not set in stone.  In fact, the remainder of § 2 requires that "[p]rior to disbursing any portion of the Escrowed Funds," Chaffe and Crosby provide "at least five (5) business days prior written notice" of any intent to disburse the escrowed funds.  Thereafter, § 2 required that Chaffe and Crosby, upon written objection, were to provide "an additional period of five (5) business days" for the resolution of any disputes as to the disbursement.  Finally, if no written instructions were received during the additional five day resolution period, Chaffe and Crosby were required to "promptly proceed to invoke a concursus" proceeding.  Thus, despite the general fifteen-day period provided at § 2(b), the remainder of the section provides *more specific* procedures that render the *general* fifteen-day period less precise than Full Spectrum argues.  See Mixon v. St. Paul

Fire & Marine Ins. Co. of St. Paul, Minn., 84 So. 790, 791 (La. 1920) ("In the interpretation of statutes and contracts the specific controls the general."); Smith v. Burton, 928 So.2d 74, 79 (La. App. 1 Cir. 2005).

A review of the time-line in this case reveals that Chaffe and Crosby followed the more specific mandates of § 2 with respect to the timeliness of the instant interpleader action. First, Full Spectrum made its initial request for disbursement on August 19, 2008. At this point, Chaffe and Crosby were required to give **at least** five days - and, thus, possibly *more than* five days - prior written notice of any intent to disburse funds. Accordingly, Chaffe and Crosby were authorized under the Escrow Agreement to give *more than five days* prior written notice, and to await the parties' response to such notice for the possibility of objections. Importantly, the Escrow Agreement *does not provide a specific time period* within which the Escrow Agent is required to act on a disbursement request after it has issued the notice of such request. In fact, the next time period provided in § 2 is triggered only "*[i]n the event that any party . . . objects,*" in which case the Escrow Agent must then grant an additional five business days for resolution of the objection. Thus, Chaffe and Crosby's failure to initiate a concursus proceeding within fifteen days of Full Spectrum's request does not on its face constitute a breach of the Escrow Agreement.

Furthermore, if Full Spectrum's request on August 19 was made before a complete breakdown of lease negotiations - in other words, if Full Spectrum's demand came at a time when the parties were still in the process of negotiating the lease - then the fifteen day period would not even have applied under the terms of the Escrow Agreement.

In any event, Chaffe and Crosby were authorized *and required* under § 2 to await written objections from the parties. Furthermore, although § 2 does not provide a specific period within which such objections should be presented to Chaffe and Crosby before further action should be taken, Louisiana law supplies a reasonable term for such further performance. See La. Civ. Code art. 1778 (providing that when the term for the performance of an obligation is uncertain "the obligation must be performed within a reasonable time"). Additionally, while the fifteen-day period provided in § 2(b) may be read as an inherent limitation on how long Chaffe and Crosby should wait for objections, the provisions of § 2(b) simply indicate that disbursement should be made within fifteen days of demand "unless the Escrow Agent has instituted a concursus proceeding in accordance with the provisions of this Agreement." Given that the "provisions of this Agreement" include the more specific time periods laid out in the remainder of § 2, the fifteen day period of § 2(b) should not be read as an indirect constraint on Chaffe

and Crosby's authority to await objections for a reasonable period of time.

Additionally, § 2 provides simply that Chaffe and Crosby should "promptly proceed to invoke a concursus" action after the objection period and the additional five day resolution period subsequent to a written objection. Rather than setting a hard-and-fast time limitation on when the concursus should be instituted, the final sentence of § 2 merely indicates that the proceeding should "promptly" follow the sequence of other periods provided in the agreement. Chaffe and Crosby instituted the present interpleader action exactly ten business days – not including the evacuation week – after WTC's objection to the disbursement. Given that fifteen days was the period within which a concursus should be instituted under § 2(b), Full Spectrum can hardly argue that ten days is not a prompt and reasonable time within which to file the interpleader action after WTC's objection.

Thus, Chaffe and Crosby's handling of the disbursement request, objection, and interpleader proceeding was proper – and by no means in bad faith. Additionally, as noted in Chaffe and Crosby's reply brief, the specific circumstances of this case undermine even further Full Spectrum's allegations of bad faith and gross negligence. Specifically, the intervention of Hurricane Gustav after Full Spectrum's demand for disbursement

further exemplifies Chaffe and Crosby's *good faith* efforts to adhere to the admittedly ambiguous provisions of the Escrow Agreement. While Full Spectrum contended at oral argument that any attempt to reset the objection period was invalid under the terms of the Escrow Agreement because it was not *in writing and signed by the parties*, the attempts by Chaffe and Crosby to meet the timing requirements of the Escrow Agreement in the midst of a city-wide evacuation were by no stretch made in bad faith. This conclusion is supported by the documents attached to Chaffe and Crosby's reply memorandum, which verify the parties' agreement to delay and re-set the objection period pending the approach of Hurricane Gustav. See Rec. Docs. 78-1-3.[7]

Finally, and notwithstanding the intervention of the hurricane, the fact that Chaffe and Crosby instituted this interpleader proceeding exactly ten business days after WTC's August 27 objection - or *fifteen business days* if the evacuation

_____

[7] Ordinarily, when a court is presented with extrinsic evidence (or matters/facts outside of the pleadings) to review in making a determination on a motion to dismiss, a court will convert the motion to dismiss into a motion for summary judgment, pursuant to rules 12 and 56 of the Federal Rules of Civil Procedure. However, such is not necessary when the court finds that the attached exhibits to a defendants' motion to dismiss are in fact part of the pleadings because the documents are central to plaintiffs' claims. Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000). Thus, in this case, although the email documents attached to Chaffe and Crosby's reply memorandum are extrinsic to the pleadings, the Court finds that they are properly presented, as they are referenced in Full Spectrum's proposed second amended complaint and central to Full Spectrum's counter-claim.

week is included - suggests that - even if the Escrow Agreement could somehow be interpreted to provide a hard-and-fast fifteen day limitation on the institution of a concursus - *Chaffe and Crosby were not acting in bad faith* when they waited until September 18 to bring the present interpleader action. On the contrary, this fact suggests that Chaffe and Crosby were attempting as far as possible to harmonize the facially contradictory provisions of § 2(b) and the remainder of § 2 in terms of their duty as Escrow Agent in light of Full Spectrum's request for disbursement. Thus, even if § 2(b) could be construed as requiring institution of a concursus proceeding within exactly fifteen days of a *demand for disbursement* - which construction the Court's above analysis refutes - Chaffe and Crosby's decision to wait until ten or fifteen business days after WTC's *objection* to the disbursement request is not indicative of bad faith given the admitted ambiguities of the § 2 time limitations. As such, given the release provisions of § 3, which relieved Chaffe and Crosby from liability for actions taken *in good faith* under the Escrow Agreement, Full Spectrum's counterclaims against Chaffe and Crosby are facially untenable.

To the extent that Full Spectrum makes conclusory allegations that Crosby acted in bad faith *as escrow agent* in delaying institution of a concursus proceeding due to his

interests *as retained counsel* for WTC and NOTB,[8] such allegations

cannot support a bad faith claim. See <u>Coliseum Square Ass'n,</u>

<u>Inc. v. Jackson</u>, 465 F.3d 215, 238 (5th Cir. 2006) (noting in

affirming district court's judgment dismissing claims that

"plaintiffs provide[d] nothing but conclusory allegations to

support their claims of bad faith"). In this case, Full Spectrum

almost concedes the speculative nature of their allegations in

the very language of its amended complaint:

> [Crosby's] and [Chaffe's] refusal to bring the concursus
> proceeding within the time allotted by the contract **was
> likely motivated** by his loyalty to his client [WTC]
> rather than his duties as escrow agent in the
> transaction. Alternatively, if Crosby's and Chaffe's
> multiple and intentional breaching of the escrow
> agreement, was [sic] not done for some motive of interest
> of ill will, it certainly constitutes gross negligence."

Rec. Doc. 67, p. 6 at ¶ XXI (emphasis added). This clearly

hypothetical allegation is insufficient to state a cause of

action for bad faith breach of the Escrow Agreement under the

standard set forth in <u>Twombly</u>. As such, Full Spectrum's amended

---

[8] Full Spectrum's allegations cited in this paragraph are
taken from their erroneously filed second amended complaint. As
discussed previously, and as addressed at further length below in
response to Full Spectrum's motion for leave, Full Spectrum's
failure to seek leave to file its second amended complaint
resulted in its amended complaint being marked deficient on the
electronic docket sheet in this case, and ultimately created a
unique procedural circumstance in which its amended allegations
were available on review of Chaffe and Crosby's motion to
dismiss. As such, the Court will refer to the amended allegation
– despite the fact that the amended complaint is not yet
technically entered in the record of this matter – in further
support of the decision to grant Chaffe and Crosby's motion.

claims against Chaffe and Crosby fail under the release provisions of § 3 of the Escrow Agreement.  See, e.g., <u>Sonnier v. Conner</u>, 998 So.2d 344, 360 (La. App. 2 Cir. 2008) (affirming grant of summary judgment based on the fact that, although "[t]he Plaintiff's petition [made] a conclusory allegation that all the Appellees were in bad faith," there were no further facts alleged to support the allegation).

## B.    Full Spectrum's Motion for Leave

The Court finds on the present record that Full Spectrum's motion for leave to file its second amended complaint should be denied under Rule 15(a)(2) of the Federal Rules.  Rule 15 requires that courts should freely grant leave to amend when justice so requires.  Fed. R. Civ. Proc. 15(a)(2). However, "[w]hile Rule 15(a) provides a rather liberal standard for granting leave to amend, it has long been recognized that certain factors weigh against granting leave."  <u>Barnes v. Madison</u>, 79 Fed. Appx. 691, 698 (5th Cir. 2003).  These factors include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." <u>Id</u>.(citing Foman v. Davis, 371 U.S. 178 (1962)). Additionally, "if the defendant can show that the proposed amended complaint would be subject to dismissal under F.R. Civ.

P. 12(b)(6) for failure to state a claim on which relief could be granted, the motion for leave to amend should be denied as futile." Stripling v. Jordan Production Company, 234 F.3d 863, 873 (5th Cir. 2000).

As explained above, even the proposed amended version of Full Spectrum's complaint fails to state a claim against Chaffe and Crosby, and thus the amendment – which given the unusual procedural posture of the amended complaint has essentially already been presented to the Court – would be futile.  In other words, even the recently deficiented and proposed amended allegations do not sufficiently state a claim of bad faith breach of the Escrow Agreement.  Accordingly,

**IT IS ORDERED** that Chaffe's **Rule 12(b)(6) Motion to Dismiss (Rec. Doc. 64)** is hereby **GRANTED**, and that Full Spectrum's counterclaims against Chaffe and Crosby are **DISMISSED WITH PREJUDICE** for failure to state a claim.

**IT IS FURTHER ORDERED** that Full Spectrum's **Motion for Leave to File 2nd Supplemental & Amending Counterclaim (Rec. Doc. 80)** is hereby **DENIED** as futile.

New Orleans, Louisiana, this __15th__ day of _____July_____ , 2009.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE